LAW OFFICE OF DALE K. GALIPO
DALE K. GALIPO, SBN 144074
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Telephone: (818) 347-3333

LAW OFFICE OF STEWART KATZ
STEWART KATZ, SBN 127425
555 University Avenue, Suite 270
Sacramento, California 95825
Telephone: (916) 444-5678

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER LANDEROS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SAMUEL SCHAFER, et al.,<br><br>Defendants. | Case No. 2:17-cv-02598-WBS-CKD<br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR NEW TRIAL**<br><br>Date: October 17, 2022<br>Time: 1:30 p.m.<br>Courtroom: 5 (14th Floor)<br>Judge: Hon. William B. Shubb |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

ARGUMENT ........ 2

Defendants' counsel falsely vouched to the jury and elicited testimony that Dr. Tovar was "independent" when in fact he was an *undisclosed* expert retained by Defendants ........ 3

A. The verdict is based upon false evidence. ........ 5

B. The falsity of Dr. Tovar's independence is newly discovered evidence. ........ 6

1. The evidence existed at the time of trial. ........ 6

2. The evidence could not have been discovered through due diligence ........ 6

3. The evidence was of such magnitude that disclosure of it earlier would have been likely to change the disposition of the case ........ 6

C. Defendants' failure to disclose Dr. Tovar constitutes discovery misconduct and deception ........ 8

CONCLUSION ........ 10

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Cryovac, Inc.*,
862 F.2d 910 (1st Cir. 1988) ........ 8

*Bunch v. United States*,
680 F.2d 1271 (9th Cir. 1982) ........ 8

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*,
762 F.3d 829 (9th Cir. 2014) ........ 2

*Hesselbein v. Beckham*,
168 F. Supp. 3d 1252 (E.D. Cal. 2016) ........ 2

*In re DePuy Orthopaedics, Inc.*,
888 F.3d 753 (5th Cir. 2018) ........ 9

*Jones v. Aero/Chem Corp.*,
921 F.2d 875 (9th Cir. 1990) (per curiam) ........ 2, 6, 8–9

*King v. GEICO Indemnity Co.*,
712 Fed. Appx. 649 (9th Cir. 2017) (mem.) ........ 2

*Molski v. M.J. Cable, Inc.*,
481 F.3d 724 (9th Cir. 2007) ........ 2

*Sandoval v. County of Los Angeles*,
622 Fed. Appx. 705, 706 (9th Cir. 2015) (mem.) ........ 2

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
251 F.3d 814 (9th Cir. 2001) ........ 2

## Statutes and Court Rules

42 U.S.C. § 1983 ........ 1

Cal. Gov't Code § 1126 ........ 6

Fed. R. Civ. P. 26 ........ 7, 9

Fed. R. Civ. P. 50 ........ 2

Fed. R. Civ. P. 59 ........ 2, 8

Fed. R. Civ. P. 60 ........ 2

**INTRODUCTION**

As the Court knows, this is a civil rights action arising from the death of Daniel Landeros while in the custody of City of Elk Grove police officers on November 30, 2016. Mr. Landeros' surviving wife and children ("Plaintiffs") sued several officers and the City ("Defendants") under 42 U.S.C. § 1983 and California law, alleging excessive force and negligence by the officers and a failure to train by the City. Between July 26 and August 4, 2022, the case was tried to a jury, which returned a verdict for Defendants. On the latter date, precisely 28 days ago, judgment was entered in accordance with the jury verdict.

But the story does not end there. On August 8, Defendants filed their Bill of Costs. Among other costs, they sought $4,000 for "Fees for Witnesses," who by statute are due an attendance fee of only $40 per day. Examination of the bill shows that this entire sum was for a single witness, Dr. Jason Tovar. Did Dr. Tovar testify for 100 days? No, of course not. Rather, as reproduced on Page 5 below, Dr. Tovar had earlier submitted "Invoice #123" to Defendants' counsel Bruce Praet in the amount of $4,000. An invoice for what? Among other things, for "Phone Communication with Mr. Praet"; for "Review of Material and Trial Preparation"; and for "Trial Testimony" — all at the rate of "$400.00/hr."

All of Dr. Tovar's well-compensated work for Defendants and their counsel would be fine (if not necessarily taxable as costs) —

- *if* Defendants had disclosed Dr. Tovar as one of their expert witnesses;
- *if* Defendants' counsel had not implied to the Court that he had no control over Dr. Tovar;
- *if* Defendants' counsel had not stated in his opening that the jury would hear the truth in the "*independent*" testimony of Dr. Tovar, in contrast to the *paid* testimony of Plaintiffs' expert;
- *if* Defendants' counsel had not begun his examination of Dr. Tovar by suggesting to the jury that the two of them had never previously communicated;
- *if* Defendants' counsel had not scripted his examination to have Dr. Tovar "absolutely" agree he was "independent and impartial" and "not affiliated with the defense"; and
- *if* Defendants' counsel had not finished his argument to the jury by emphasizing that it had heard the "*completely independent*" chief medical examiner of Sacramento County.

In so doing, Defendants and their counsel deceived the Court and the jury, procuring the decision with loaded gloves. On these facts, and under well-established and recently applied law, a new trial is warranted as elaborated below.

**ARGUMENT**

Under Rule 59(a)(1)(A), a "court may, on motion, grant a new trial . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." As this Court observed a few years ago, even "if substantial evidence supports the jury's verdict, a trial court may grant a new trial if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Hesselbein v. Beckham*, 168 F. Supp. 3d 1252, 1262 (E.D. Cal. 2016) (Shubb, J.) (quoting *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001)). In contrast to a Rule 50 motion for judgment as a matter of law, "the district court, in considering a Rule 59 motion for new trial, is not required to view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Id.* (quoting *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014)). Indeed, the "Ninth Circuit has emphasized that, under Rule 59, the district court has 'the duty to weigh the evidence as the court saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in the court's conscientious opinion, the verdict is contrary to the clear weight of the evidence.'" *Id.* (cleaned up; quoting *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007)).

In addition, a new trial may be granted on the basis of "newly discovered evidence" or of "discovery misconduct." *See Jones v. Aero/Chem Corp.*, 921 F.2d 875, 877–79 (9th Cir. 1990) (per curiam); *accord, e.g., Sandoval v. County of Los Angeles*, 622 Fed. Appx. 705, 706 (9th Cir. 2015) (mem.) (applying *Jones* to motion for new trial based on alleged newly discovered evidence); *King v. GEICO Indemnity Co.*, 712 Fed. Appx. 649, 651–52 (9th Cir. 2017) (mem.) (applying *Jones* to motion for new trial based on alleged discovery misconduct). The test for the latter is "borrowed from cases interpreting Rule 60(b)(3)," which affords relief when "the verdict was obtained through fraud, misrepresentation, or other misconduct." *Jones*, 921 F.2d at 878–79.

Here, the verdict "is based upon evidence which is false," and when that evidence is rightly excluded from the calculus, the verdict "is contrary to the clear weight of the evidence." The falsity of this key evidence for Defendants is revealed by newly discovered evidence, which demonstrates discovery misconduct (akin to fraud and misrepresentation) by Defendants. In these circumstances, granting a new trial would "prevent . . . a miscarriage of justice."

**Defendants' counsel falsely vouched to the jury and elicited testimony that Dr. Tovar was "independent" when in fact he was an *undisclosed* expert retained by Defendants.**

There was no dispute at trial that Mr. Landeros died in the custody of the defendant police officers. Rather, the dispute was over who or what was responsible for that death. Defendants' counsel emphasized that point in his opening statement: "The real issue in this case is going to be what caused the death of" Mr. Landeros. Appendix at 28:14–15.[*] Or, as counsel phrased it a few sentences later, the jury would have to answer the question, "what caused the death"? *Id.* at 28:23. Indeed, the cause of death in this case was directly linked to whether the defendant officers used excessive force against Mr. Landeros. *See, e.g., id.* at 59:23–25 (closing argument of Defendants' counsel that the death occurred *during* restraint by the officers, but that the restraint itself did not cause the death).

As Defendants' counsel framed the question, it would be the veritable battle of the experts. On the one hand, the jury was "going to hear from Dr. O'Halloran, that Mr. Galipo introduced to you." Appendix at 28:23–24. But the jury should be skeptical of Plaintiffs' expert O'Halloran, because he was essentially a hired gun: "Since he's retired in 2013, Mr. Galipo's office has hired him on at least 15 to 20 cases. Every single case Dr. O'Halloran has rendered an opinion on, at $400 an hour, he said the cops killed him with restraint asphyxia. Every single time, that's his conclusion." *Id.* at 29:3–7. On the other hand, the jury would hear from "Dr. Chan, who we're going to call." *Id.* at 29:10–11. Naturally, Defendants' counsel skipped over the fact that Dr. Chan was being paid by Defendants and instead emphasized his expert's credentials: "Dr. Chan is currently

---

[*] "Appendix" stands for Plaintiffs' Appendix of Evidence in Support of Their Motion for New Trial, filed concurrently herewith. The Appendix is paginated consecutively in the upper-right corner of the page from Page 1 to Page 106.

the chief of emergency medicine at UC San Diego. Nationally recognized expert. He's an actual practicing physician, working on living patients. He's actually conducted many studies, including published, peer-reviewed studies, which completely debunk this theory of restraint or positional asphyxia." *Id.* at 29:11–16.

All of this is perfectly normal stuff of opening statements and perfectly within the bounds of proper advocacy. But Defendants' counsel was not satisfied to leave it a "he said, he said" back and forth. No, he had a trump card in the battle of the experts: "You're also going to hear from a third doctor, and that's Dr. Jason Tovar," who is "the chief medical examiner here in Sacramento County." Appendix at 31:2–4. But what was unique about Dr. Tovar? Why should the jury give him any special regard? Defendants' counsel answered those questions for the jury: Dr. Tovar, he emphasized, "*hasn't been hired by either side*." *Id.* at 31:3 (emphasis added). Indeed, so crucial was the independence of Dr. Tovar to Defendants' case on the all-important cause of Mr. Landeros' death that Defendants' counsel emphasized that independence over and over, from first to last:

- Pretrial conference: Defendants' counsel insinuated that Dr. Tovar was merely an ordinary witness over whom he had no control, twice prompting the Court to advise counsel to "get him under subpoena." *See id.* at 21:24–22:20.
- Later in his opening statement: "Dr. Tovar will also disagree with Dr. O'Halloran, and he's going to testify he found no evidence, no evidence, that Daniel Landeros died of restraint or any other type of asphyxia. . . . In fact, Dr. Tovar's *independent* testimony will be Daniel Landeros died of a sudden heart attack resulting from methamphetamine intoxication and other self-induced stressors." *Id.* at 31:12–15 (emphasis added).
- Seemingly scripted direct examination of Dr. Tovar: "Q. You and I met for the first time out in the hallway this morning? A. Yes. Q. And you're here by way of subpoena, right [i.e., *not* voluntarily]? A. Correct." *Id.* at 35:12–15.
- Further seemingly scripted direct examination: "Q. Do you consider yourself *independent and impartial*? A. Yes, absolutely. Q. You're *not affiliated with the defense* or the plaintiffs in this case, correct? A. Absolutely. Correct." *Id.* at 37:3–7 (emphasis added).

///

- Closing argument: "You heard the *completely independent* chief medical examiner [of Sacramento County], Dr. Tovar" — who is the "*key witness*" in the case — opine that "Daniel Landeros died of cardiac arrest." *Id.* at 59:18–22 (emphasis added).

**A. The verdict is based upon false evidence.**

But the vaunted independence of Dr. Tovar was a lie. In fact, as first revealed in Defendants' post-trial bill of costs, the testimony elicited by Defendants' counsel — along with counsel's reiteration of that testimony in closing argument — was "false evidence." In truth, Dr. Tovar was *retained by Defendants' counsel and paid **at least** $4,000 to prepare and give his trial testimony*. *See* Appendix at 91 (claiming "Fees for witnesses" in the amount of $4,000). "Invoice #123" from "Jason Tovar's Company" tells the story:

Case 2:17-cv-02598-WBS-CKD Document 116 Filed 08/08/22 Page 8 of 26

Invoice #123

Jul 28, 2022

BILL TO
Bruce D. Praet
1631 E. 18th Street
Santa Ana, CA 92705
bpraet@aol.com

FROM
Jason Tovar's Company
1140 Castec Dr
Sacramento, CA 95864
jtovarmd@mac.com
+1 6192495389

| INVOICE ITEMS | AMOUNT |
|---|---|
| Phone Communication with Mr. Praet<br>1 hr x $400.00/hr | $400.00 |
| 7/28/22 Review of Material and Trial Preparation<br>4 hrs x $400.00/hr | $1,600.00 |
| 7/29/22 Travel time to and from court<br>1 hr x $400.00/hr | $400.00 |
| 7/29/22 Trial Testimony<br>4 hrs x $400.00/hr | $1,600.00 |

$4,000.00

PAYMENT DUE

Appendix at 93.

**B. The falsity of Dr. Tovar's independence is newly discovered evidence.**

Moreover, the invoice establishing the falsity of Dr. Tovar's testimony (and consequent deception by Defendants' counsel is "newly discovered" evidence under the test articulated by the Ninth Circuit, namely, the "evidence (1) existed at the time of the trial, (2) could not have been discovered through due diligence, and (3) was of such magnitude that production of it earlier would have been likely to change the disposition of the case." *Jones*, 921 F.3d at 878 (internal quotation marks omitted).

**1. The evidence existed at the time of trial.**

The evidence "existed at the time of the trial," in that the invoice is dated July 28, 2022, *during* the trial at which he testified in Defendants' favor. Moreover, Dr. Tovar's relationship with Defendants' counsel was necessarily established *before* trial.

**2. The evidence could not have been discovered through due diligence.**

The invoice and the underlying relationship could not have been discovered through due diligence. Rather, as described more fully below, Dr. Tovar's status as a retained and compensated expert for Defendants should have been — but was not — disclosed during discovery. Absent any contrary indication (of which there was none), it was reasonable for Plaintiffs to presume that Defendants and their counsel would comply with their basic discovery obligations. Moreover, Plaintiffs' lead counsel Dale K. Galipo has participated in numerous trials in which a government-employed pathologist like Dr. Tovar has testified, and he has *never* observed such a pathologist personally charging a party for his or her testimony regarding an autopsy conducted within the scope of such employment. *See* Appendix at 104, ¶ 2. And for good reason: a state statute provides that with limited exceptions, "a local agency officer or employee shall not engage in any employment, activity, or enterprise for compensation which is inconsistent, incompatible, in conflict with, or inimical to his or her duties as a local agency officer or employee." Cal. Gov't Code § 1126(a).

**3. The evidence was of such magnitude that disclosure of it earlier would have been likely to change the disposition of the case.**

Defendants' relationship with Dr. Tovar as a retained and compensated expert was of such magnitude that earlier disclosure would likely have changed the disposition of the case. Recall

that Defendants' counsel called the cause of Mr. Landeros' death the "real issue in this case," and he effectively linked to issue of causation with whether the defendant officers used excessive force. Thus, no fewer than seven times did Defendants' counsel elicit from Dr. Tovar the opinions that such cause was "[s]udden death during restraint and methamphetamine intoxication," *not* "asphyxia" resulting from the actions of the defendant officers. *Id.* at 38:8–12; *accord id.* at 38:13–16, 39:17–22, 42:24–43:10, 46:13–16, 47:11–24. Moreover, Dr. Tovar repeatedly implied that he saw no evidence from the videos that the defendant officers applied unreasonable pressure to Mr. Landeros to cause asphyxiation. *See id.* at 46:19–47:4, 49:1–13, 49:20–50:7. No fewer than five times did Defendants' counsel cite Dr. Tovar's opinions in his closing argument. *See id.* at 59:18–22, 60:1–3, 62:6–9, 70:8–10, 72:5–10. As documented above (pp. 4–5), Defendants' counsel at least five times emphasized to the jury that it should credit Dr. Tovar's opinions because he was "completely independent." Counsel contrasted that purported independence especially with the fact that Plaintiffs' expert was paid "$400 an hour," *id.* at 29:5 — ironically the very same rate at which Defendants were paying Dr. Tovar! The jury could not, and most certainly did not, ignore this evidence and argument. Indeed, the jury was *instructed* to consider, among other things, "the witness's interest in the outcome of the case and any bias of prejudice" in deciding which testimony to believe and which not to believe. *See id.* at 89.

Moreover, disclosure of the fact that Dr. Tovar was *not* independent, but rather in the pay of Defendants, would have significantly altered Plaintiffs' pretrial and trial strategy. First and most obviously, Plaintiffs would have deposed Dr. Tovar with his Rule 26(a)(2)(B) report in hand. *See* Appendix at 104, ¶ 3. In that deposition, Plaintiffs "would have inquired into the amount of compensation that he was receiving, as well as any other cases in which Dr. Tovar had been retained as an expert witness, particularly any law enforcement restraint death cases." *Id.* at 105, ¶ 4. Moreover, Plaintiffs "would have explored the ethical issues arising when a public employee whose annual compensation exceeds $420,000 receives additional remuneration for simply discharging a function that is part of his official job description, i.e., to 'Testify clearly and concisely at public hearings, [in] courts of law, and before the Grand Jury in a professional, neutral, and convincing manner.'" *Id.* at 102, ¶ 5; *see also id.* at 95 (annual compensation for 2021); *id.* at 98 (job description). The

deposition likewise would have explored the extent to which Dr. Tovar's opinions — as reflected in his trial testimony — went far beyond his autopsy report. *See id.* at 105, ¶ 5 (methamphetamine intoxication, back bruising from CPR, predisposition to cardiac arrest, and videos showing no evidence of asphyxia); *see also id.* at 105, ¶ 6 (whether Dr. Tovar had reviewed video evidence).

At trial, Mr. Galipo would have reframed his "opening statement, [his] cross-examination of Dr. Tovar, and [his] closing argument." Appendix at 105, ¶ 7. Regarding his cross-examination in particular, Mr. Galipo "deliberately tailored [his] tone and intensity to account for the fact that the jury would likely view Dr. Tovar as simply 'a public servant simply doing his job.'" *Id.* at 105, ¶ 8. Of course, given the deception, Mr. Galipo "had no incentive or ability to explore [Dr. Tovar's] motive and bias as a witness paid by one side only, because it was never disclosed that he was being compensated at $400 per hour for reviewing the case, preparing for trial, and giving trial testimony, or whether he has been retained by Defendants' counsel Bruce Praet in any other cases." *Id.* Nor to explore the ethical issues raised by a highly compensated public employee's *receiving additional remuneration* for simply doing his job. *See id.* at 102, ¶ 5.

In sum, on the crucial if not dispositive issue of the cause of Mr. Landeros' death, the jury would have heard a very different case from both sides. Considering the totality of these circumstances, the falsity of Dr. Tovar's independence was likely dispositive.

**C. Defendants' failure to disclose Dr. Tovar constitutes discovery misconduct and deception.**

Finally, Defendants' failure to disclose Dr. Tovar as their retained and compensated expert is "discovery misconduct," because "[f]ailure to disclose or produce materials . . . in discovery can constitute 'misconduct' within the purview" of a Rule 59 motion for a new trial, *even if* that failure is "accidental." *Jones*, 921 F.2d at 879 (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988)). A movant must also "establish that the conduct complained of prevented [him] from fully and fairly presenting his case or defense. Although when the case involves the withholding of information called for by discovery, the [moving] party *need not establish that the result in the case would be altered*." *Id.* (emphasis added; quoting *Bunch v. United States*, 680 F.2d 1271, 1283 (9th Cir. 1982)).

Here, Defendants failed to disclose Dr. Tovar as their retained and compensated expert, as required by Federal Rule 26(a)(2)(A) and by this Court's scheduling order. *See* Appendix at 6–7 (order). When Defendants disclosed their experts, they named George Williams and Dr. Theodore Chan — but *not* Dr. Jason Tovar. *See id.* at 13. Indeed, Dr. Tovar first appeared on Defendants' witness list (and not even as a *non*-retained expert), disclosed a mere week before trial. *See id.* at 18. Therefore, Dr. Tovar was never deposed, and so he could never be cross-examined by Plaintiffs about his independence vel non, including his compensation. As described in the previous section, moreover, Defendants' failure to truthfully disclose Dr. Tovar severely impacted Plaintiffs' trial strategy, especially including Mr. Galipo's cross-examination of Dr. Tovar.

The Fifth Circuit recently addressed a similar case in which it was discovered after trial that plaintiffs' "non-retained" experts had actually been compensated by plaintiffs' counsel. *See In re DePuy Orthopaedics, Inc.*, 888 F.3d 753, 787–92 (5th Cir. 2018). As for the propriety of that kind of arrangement, the court stated the obvious: "Lawyers cannot engage with a favorable expert, pay him 'for his time,' then invite him to testify as a purportedly 'non-retained' neutral party. *That is deception, plain and simple*." *Id.* at 791 (emphasis added). As for the requisite showing of prejudice, the court held that the party subjected to misconduct (like Plaintiffs here) "need only show that the alleged misrepresentations foreclosed potentially promising cross-examination tactics; the misrepresentations need not be outcome-determinative, nor even intentional, to compel reversal." *Id.* at 790 (applying the same "prevented the losing party from fully and fairly presenting his case" standard applied by the Ninth Circuit in *Jones*). The deceptive plaintiffs' counsel had "emphasized to the court the 'importance' of [the witnesses'] pro bono testimony," and that counsel "repeatedly leveraged the false contrast between defendants' paid mercenaries and plaintiffs' unpaid altruists to his clients' advantage. At the least, disclosure would have enabled defendants to try to impeach the [witnesses] with evidence of compensation." *Id.* at 792 (cleaned up). In these circumstances, the court of appeals easily concluded that that "the deceptions obviously prevented defendants from 'fully and fairly' defending themselves," and it held that the "district court abused its discretion in concluding otherwise. Calculated or not, falsehoods marred plaintiffs' victory. The verdict cannot stand." *Id.*

This Court should similarly conclude Defendants' failure to disclose their relationship with Dr. Tovar — especially seen in light of the outsized role played by his opinions — prevented Plaintiffs from fully and fairly presenting their case on the crucial issue of the cause of Mr. Landeros' death. And this Court should similarly hold that falsehoods marred Defendants' victory, such that the verdict cannot stand.

**CONCLUSION**

For three independent reasons having their common source in Defendants' deception of the Court, the jury, and Plaintiffs regarding the independence of Dr. Jason Tovar — a verdict based on false evidence, newly discovered evidence, and discovery misconduct — a new trial is warranted. Granting a new trial would prevent a miscarriage of justice.

The Court should grant a new trial.

Respectfully submitted,

Dated: September 1, 2022

**LAW OFFICES OF DALE K. GALIPO**
**LAW OFFICE OF STEWART KATZ**

By *__________/s/ Stewart Katz__________*
Dale K. Galipo
Stewart Katz

*Attorneys for Plaintiffs*