```
Bruce D. Praet SBN 119430
FERGUSON, PRAET & SHERMAN
A Professional Corporation
1631 East 18th Street
Santa Ana, California  92705
(714) 953-5300 telephone
(714) 953-1143 facsimile
Bpraet@aol.com
```

Attorneys for Defendants

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER LANDEROS, et al.<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>SAMUEL SCHAFER, et al.,<br><br>　　　　　Defendants. | NO. 2:17-CV-02598 WBS CKD<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR NEW TRIAL**<br><br>**[With Declaration and Exhibits]**<br><br>**DATE: October 17, 2022**<br>**TIME: 1:30 p.m.**<br>**CTRM: 5** |

**1.    PREFATORY STATEMENT.**

While no party or attorney wants to lose a trial, Plaintiffs' sole basis for seeking a new trial is flawed in that it asserts that the verdict "*is based on evidence which is false*". [Doc. 130-1, p. 6].  Yet, this purportedly "false evidence" is premised entirely on the notion that in opening and closing statements, "*Defendants' counsel falsely vouched to the jury*" [*Id.*] that Dr. Tovar, the Sacramento County Chief Medical Examiner who performed the actual autopsy on the decedent, was independent.  However, as the Court correctly instructed the jury "arguments and statements by lawyers are not evidence." [Jury Instruction No. 3, Doc. 109, p. 4].  Critically, Plaintiffs have not and cannot cite to a single instance of false evidence presented by Dr. Tovar.

1

On the contrary, Dr. Tovar truthfully testified throughout every aspect of his direct and cross-examination:

- Dr. Tovar honestly considered himself independent and impartial. [Doc. 130-2, p.37]
- Dr. Tovar is not affiliated with either the defense or plaintiffs in this case. [*Ibid.*]

The remainder of Dr. Tovar's testimony related entirely to the content of his official autopsy report which Defendants provided to Plaintiffs with their initial disclosures way back on June 7, 2018, when he was also listed as a witness. [See exhibit "1" attached hereto]. Plaintiffs' post-trial claim that Dr. Tovar was first listed as a defense witness just two weeks before trial is simply not true. Defendants not only included him in their 2018 initial disclosures, but both parties included him as a witness again in their original witness lists on April 9, 2020. [See: exhibits "2" and "3" attached hereto] Fully informed of Dr. Tovar's status as the examining pathologist in this case, Plaintiffs also listed him as a percipient expert in their 2019 disclosure. [See: exhibit "4" attached hereto]  Finally, both parties again listed Dr. Tovar in their final witness lists prior to trial [Doc. 78 and Doc. 86].  At no time was Dr. Tovar or the scope of his trial testimony ever a secret.

While Plaintiffs now conveniently suggest that they would have deposed Dr. Tovar if they had received a Rule 26 expert report from him, non-retained experts are not required to provide expert reports. *F.R.Civ.P., Rule 26(A)(2)(C).* Fully aware that Dr. Tovar was the forensic pathologist performing the autopsy on decedent as of 2018, Plaintiffs presumably elected not to depose him since his report did not support their myopic theory of "restraint asphyxia".

In fact, at the final Pre-Trial Conference on July 5, 2022, Plaintiffs' counsel expressly remained non-committal as to whether they would be calling Dr. Tovar as their own witness in their case in chief and instead encouraged Defense counsel

2

to "*get him under subpoena if he wants to call him*". [Doc. 130-2, p. 20] At no time did Plaintiffs object to Dr. Tovar being called by the defense. Under the circumstances and, at the Court's direction [*Ibid.*], on July 18, 2022, Defendants served Dr. Tovar (and Plaintiffs) with a trial subpoena requiring his appearance on July 29, 2022, by stipulated scheduling of all counsel. Under the fee amount on the subpoena was stated "*TBD"* [See: Exhibit "5" attached hereto]

    Beyond the irrelevant claim that the non-evidentiary opening and closing statements of defense counsel opined that Dr. Tovar was independent (a nonetheless true statement), Plaintiffs feign shock and surprise to learn after trial that Dr. Tovar was paid his reasonable fee of $400/hour.[1] As further set forth below, such fees are not only appropriate for an examining physician, but Plaintiffs elected to never ask the question. Plaintiffs' counsel, Dale Galipo and Stewart Katz, are both very experienced trial lawyers who were, with minimal diligence, quite capable of simply asking Dr. Tovar how much and by whom he was being paid to appear at trial. Whether Plaintiffs had simply placed a phone call to the office of the medical examiner, had asked at trial or if they had sought to depose him as the examining physician, they would have discovered that Dr. Tovar's appearance for any party in a civil matter will either be billed to the party by the County of Sacramento at $365/hour or, if Dr. Tovar appears on his own time, at a standard rate of $400/hour. [See: Declaration of Bruce D. Praet] It is rather incredulous to now suggest that it comes as a sudden post-trial surprise that Dr. Tovar was compensated for his time to prepare for and appear at trial.

    As further evidence that Dr. Tovar maintained his independence exclusively as the examining forensic pathologist, it is noteworthy that he allocated only one

---

[1] While Dr. Tovar's position as Chief Medical Examiner only requires him to appear in criminal cases within the scope of his employment, the County of Sacramento permits him to appear in civil matters either on-duty ($365/hour paid directly to the county) or utilizing personal time ($400/hour paid to Dr. Tovar).

3

1  hour to telephone conversations with defense counsel. [See: Doc. 130-2, p. 93].
2  The entirety of these conversations encompassed nothing more than reviewing Dr.
3  Tovar's original report (in possession of Plaintiffs since 2018) and scheduling his
4  trial appearance, ultimately required by subpoena. [See: Declaration]. Ironically,
5  when Dr. Tovar asked defense counsel if he should receive reports from
6  designated experts for either or both sides, these reports were expressly withheld
7  in order to insure his independence. [*Ibid.*]  Beyond this combined one hour of
8  conversation with defense counsel, the remainder of Dr. Tovar's time was his
9  unassisted time reviewing his own file and actually appearing at trial.
10      Besides the fact that Plaintiffs' counsel simply never asked Dr. Tovar about
11  his fees, it is perhaps more important that his substantive testimony was
12  completely truthful and consistent with his original autopsy report. [Trial exhibit
13  "10"] Although Plaintiffs would have ultimately preferred that Dr. Tovar never
14  testify, his trial testimony mirrored his original autopsy findings consistent with
15  the actual evidence:

- Daniel Landeros died as a result of methamphetamine intoxication. [Doc. 130-2, p. 39-40]
- Daniel Landeros' pre-existing enlarged heart predisposed him to death. [Doc. 130-2, p. 42-43]
- Daniel Landeros died of cardiac arrest with no evidence of asphyxia. [Doc. 130-2, 46]

22      Dr. Tovar's testimony was also consistent with the trial evidence that the
23  final impression of the attending Emergency Room physician that Daniel Landeros
24  died as a result of "cardiac arrest". [Trial exhibit "12" referenced throughout trial]
25  Ironically, even Plaintiffs' own retained Dr. O'Halloran, ultimately (albeit
26  stubbornly) agreed on cross-examination that Daniel Landeros could have died of
27  cardiac arrest as a result of the high level of methamphetamine combined with
28

4

1  other self-induced stressors without any contact with law enforcement.[2]

2  The bottom line is that there was not a shred of "false" testimony or evidence in this case. More importantly, the properly admitted evidence overwhelmingly supported the jury's unanimous defense verdict. Given that the jury's only question was a request to review the BWC video [Doc. 112] before returning their unanimous verdict just 90 minutes later, there is not even the slightest inference that payment of reasonable fees to Dr. Tovar (never asked) would have had even a remote influence on the outcome of this case.

As counsel for both parties noted after the verdict, this was a very fair and well conducted trial. It is therefore time for the parties to accept the verdict and for the Court to deny the motion for a new trial.

**2.      THERE IS NO LEGAL OR FACTUAL BASIS TO GRANT A NEW TRIAL.**

*F.R.Civ.P., Rule 59(a)(1)(A)* allows the Court to grant a new trial only "for any reason for which a new trial has heretofore been granted in an action at law in federal court." It is initially worth noting that Plaintiffs have failed to cite even a single case in which a new trial was granted under the grounds asserted here.[3]

Instead, Plaintiffs rely on a single case permitting a new trial based upon a finding of "newly discovered evidence" only if Plaintiffs meet their substantial

---

[2] Due to time constraints for filing this opposition, the official transcript of Dr. O'Halloran's testimony could not be obtained. However, Defendants noted in closing argument [Doc. 130-2, p. 72] and the Court will undoubtedly recall the extraordinary reluctance of Dr. O'Halloran to even admit this indisputable fact.

[3] Perhaps attempting to appeal to the Court's memory of its extraordinary grant of a new trial in *Hesselbein v. Elk Grove*, 168 F.Supp.3d 1252 (E.D. Cal. 2016), there are no parallels between the two cases. In *Hesselbein*, this Court granted a new trial (1) because of the improper introduction of what was subsequently determined to be inadmissible character evidence (e.g. no prior officer-involved shootings), and (2) what the Court concluded was a scarcity of evidence to support the verdict. Here, neither issue exists.

burden of showing that the evidence (1) existed at the time of the trial, (2) could not have been discovered through due diligence, and (3) was "of such magnitude that production of it earlier would have been likely to change the disposition of the case. *Jones v. Aero/Chem, 921 F2d 875, 878 (9th Cir. 1990).* This heightened burden is consistent with the Ninth Circuit rule long ago established that a party may obtain a new trial to present newly discovered evidence only when it appears (1) that the proposed evidence deals with facts existing at the time of trial, (2) that the aggrieved party was excusably ignorant of these facts, (3) that he could not have found these facts by the exercise of reasonable diligence before trial, (4) that the evidence is material and not merely cumulative, and (5) that the evidence would materially change the result of the trial. *Raynor v. United States, 323 F2d 519, 523 (9th Cir. 1963)*

      In the instant case, Plaintiffs' argument critically fails on several key prongs. First and foremost, the hourly rate for any party to have Dr. Tovar appear as an examining physician in a civil case not only "existed at the time", but was easily ascertained with only minimal diligence [i.e. either (1) a simple telephone call to Dr. Tovar at any time between 2018 and the 2022 trial, or (2) a simple question on cross-examination about his fees]. A request for a new trial will be denied unless the moving party can meet the heightened burden of establishing that they were "excusably ignorant" of relevant information. *Rodriguez v. ACCC Ins.*, 833 Fed Appx 82, fn.2 (9th Cir. 2020), citing *U.S. v. Bransen*, 142 F2d 252, 255 (9th Cir. 1944) - subsequent discovery of the importance of evidence which, with the exercise of due diligence, was available to the moving party is not grounds for new trial.]

      Not only has the discovery that an examining physician has been paid a reasonable appearance fee never before served as a basis for a new trial, but discovery that a witness is paid more than the statutory fee will not serve as grounds for a new trial. *Smith v. Allen, 212 F.Supp. 713 (E.D. Va. 1962).* It

6

should come as no surprise to these experienced trial attorneys that, due to their expertise, non-retained treating physicians are entitled to reasonable compensation beyond statutory fees afforded mere fact witnesses. *Axelson v. Hartford Ins,* 2013 U.S. Dist. LEXIS 43335 (D.C. Nev. 2013)

Plaintiffs' citation to *In re DePuy Orthopaedics,* 888 F3d 753 (5th Cir. 2018) is not only misplaced, but easily distinguished. In *DePuy,* attorneys for the Plaintiff had a pre-trial meeting with a doctor at his home and made a $10,000 "donation" to the doctor's charity, none of which was ever disclosed to the defense. Moreover, as a "thank you" for his testimony, plaintiff's counsel made another sizable post-trial "donation" to the doctor's charity. Under such extraordinary circumstances, it is no wonder why the court granted a new trial. However, the extraordinary facts of *DePuy* were subsequently distinguished in *Jordan v. Maxfield & Oberton Holdings,* 977 F3d 412, 420 (5th Cir. 2020) wherein a new trial under Rule 60(b)(3) was denied because the moving party failed to meet their substantial burden of showing that the purportedly withheld evidence was not otherwise available through public sources. Similarly, Dr. Tovar's hourly rate as a public official was easily available with just a simple phone call to the County of Sacramento.

Finally, it is highly unlikely that the easily ascertained fact that Dr. Tovar was reasonably compensated for his subpoenaed appearance at trial (regardless of which side called him) would have materially changed the outcome of this case. Dr. Tovar testified entirely consistent with his original autopsy report and the final impression of the examining ER doctor that decedent succumbed to cardiac arrest. This testimony would not have varied based on the amount, if any, of fees paid to Dr. Tovar. The fact that his percipient findings and opinions differed from Dr. O'Halloran were the result of his examination of the body of Daniel Landeros and not the amount of fees he was paid. Albeit reluctantly, Plaintiffs' own expert, Dr. O'Halloran ultimately agreed that decedent could have died of cardiac arrest as a

result of the high levels of methamphetamine, his enlarged heart and his own self-initiated conduct even if never interacting with or restrained by officers. While this was contrary to Plaintiffs' completely unsupported theory of "restraint asphyxia", it was entirely supported by all of the evidence admitted at trial.

Whether under Rule 59 or Rule 60, Plaintiffs' have failed to meet the substantial burden required for granting a new trial.

### 3.  CONCLUSION.

While Plaintiffs' tragic loss can never be denied, the unanimous jury verdict was supported by overwhelming evidence and was not the result of any misleading, much less "false" evidence. As such, it is respectfully requested that the Court deny Plaintiffs' motion for a new trial.

DATED: September 12, 2022     FERGUSON PRAET & SHERMAN
                              A Professional Corporation

                              By:  /s/ Bruce Praet
                                   Bruce D. Praet,
                                   Attorneys for Defendants

1  **DECLARATION OF BRUCE D. PRAET**

2  I, Bruce D. Praet, declare and say:

3  1. That I am an attorney duly licensed to practice before this and all courts in the State of California. From the outset of this litigation through the present, I have been defense counsel for all Defendants and, except where expressly stated to the contrary, I make this declaration from personal knowledge. If called as a witness, I would testify in conformity herewith.

2. As a part of Defendants' initial disclosures under Rule 26 on June 7, 2018, I listed Dr. Jason Tovar as a witness and provided Plaintiffs with a copy of his entire autopsy report. [See: true and correct copy of Initial Disclosures attached hereto as exhibit "1"]

3. Confirming their knowledge of Dr. Tovar as the examining forensic pathologist, Plaintiffs included him as a percipient expert in their expert disclosures served on October 25, 2019. [See: true and correct copy attached hereto as exhibit "4"]

4. When this case was set for trial in 2020 [Doc. 24], I included Dr. Jason Tovar as a witness on Defendants' Witness List exchanged with Plaintiffs' counsel on April 9, 2020. [See: true and correct copy attached hereto as exhibit "2"] At the same time, Plaintiffs provided their Witness List, including Dr. Jason Tovar as one of their own witnesses. [See: true and correct copy attached hereto as exhibit "3"]

5. Knowing that both parties had listed Dr. Tovar as a witness, I placed a telephone call to Dr. Tovar at the Office of the Sacramento County Medical Examiner sometime in early June, 2022. When Dr. Tovar returned my call, he informed me that he had not been previously contacted by any legal counsel regarding this case. In anticipation that Dr. Tovar would be called as a witness at trial by one side or the other, he pulled his original file and confirmed his findings during our perhaps 30 minute conversation.

///

6. In the event that Defendants needed to call Dr. Tovar as a percipient witness, I inquired regarding his fees. Dr. Tovar informed me that while he is required to testify in criminal cases in his role as Chief Medical Examiner, the County of Sacramento allows him to testify in civil matters under either of two arrangements. If Dr. Tovar appears in a civil matter while on-duty, his fees are paid directly to the County at a rate of $365/hour. Alternatively, Dr. Tovar informed me that he has the option to appear in civil matters on his own personal time at a rate of $400/hour.

7. Throughout multiple telephone and email communications with Plaintiffs' counsel during June, 2022, I was informed that they remained uncertain whether they would be calling Dr. Tovar as a witness in their case in chief. Recognizing that the defense would need to call Dr. Tovar if he wasn't called by Plaintiffs, I again telephoned Dr. Tovar to ascertain his availability for trial. During that conversation, Dr. Tovar asked if he should review the expert reports of Dr. Chan and Dr. O'Halloran. I declined to share these reports with Dr. Tovar, informing him that it was important that he rely solely upon his own observations and findings in order to maintain his impartiality. Dr. Tovar understood and informed me that he would not be available for trial after July 29, 2022. I immediately informed Plaintiffs' counsel of this restricted availability and Attorney Galipo assured me that he would have no problem accommodating Dr. Tovar's schedule as long as he testified after Dr. O'Halloran.

8. During the final Pretrial Conference on July 5, 2022, I again raised the question of whether Plaintiffs would be calling Dr. Tovar as a witness in their case. Mr. Galipo continued to express uncertainty and, while reaffirming his willingness to accommodate Dr. Tovar's schedule, encouraged Defendants to arrange for his appearance by subpoena. [Doc. 130-2, p. 20] With the Court's concurrence and direction, I issued a trial subpoena for Dr. Tovar's appearance on July 29, 2022. Not yet knowing the amount of time Dr. Tovar would spend

1 appearing at trial (except for perhaps the initial hour), the "fee" section of the
2 subpoena was listed as "TBD". [See: true and correct copy attached hereto as
3 exhibit "5"].  This trial subpoena was served on Dr. Tovar and Plaintiffs as of July
4 18, 2022.
5     9.  Except for aforementioned telephone calls totaling perhaps one hour, I
6 never met or had any other contact with Dr. Tovar until he appeared at trial on July
7 29, 2022, in response to the trial subpoena.
8     I declare under penalty of perjury that the foregoing is true and correct and
9 that this declaration was executed by me on September 12, 2022, at Santa Ana,
10 California.

11                                         /s/ Bruce D. Praet
                                          Bruce D. Praet